UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Elizabeth Ristovski, *et al.*,

      Plaintiffs,

v.                              Civil Action No. 16-13008

Midfield Concession Enterprises, Inc.,      Sean F. Cox
                                        United States District Court

      Defendant.

_____/

## OPINION & ORDER
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs are three individuals who were previously employed by Defendant at its various restaurants at Detroit Metropolitan Airport. They brought this action against Defendant, alleging that Defendant violated the Fair Labor Standards Act. Specifically, they allege that they were not exempt from the overtime provisions of the Act but that Defendant nevertheless failed to pay them overtime wages for all time worked in excess of forty hours per week. The matter is currently before the Court on Defendant's Motion for Summary Judgment. The parties have briefed the issues and the Court heard oral argument on August 10, 2017.

As explained below, the Court shall DENY the motion because genuine issues of fact exist as to whether Defendant can avail itself of the executive exception.

## BACKGROUND

Plaintiffs Elizabeth Ristovski, Brett Sullivan, and Abbas Abbas (collectively "Plaintiffs") filed this action against Defendant Midfield Concession Enterprises, Inc. ("Defendant") on

August 18, 2016.  Plaintiffs made a jury demand.  Plaintiffs allege that Defendant violated the

federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*  Plaintiffs allege that they were not

exempt from the overtime provisions of the Act but that Defendant nevertheless failed to pay

them overtime wages for all time worked in excess of forty hours per week.

Following the close of discovery, Defendant filed a Motion for Summary Judgment.

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in

this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a.  The moving party's papers shall include a separate document entitled
> Statement of Material Facts Not in Dispute.  The statement shall list in separately
> numbered paragraphs concise statements of each undisputed material fact,
> supported by appropriate citations to the record. . .
>
> b.  In response, the opposing party shall file a separate document entitled
> Counter-Statement of Disputed Facts.  The counter-statement shall list in
> separately numbered paragraphs following the order or the movant's statement,
> whether each of the facts asserted by the moving party is admitted or denied and
> shall also be supported by appropriate citations to the record.  The Counter-
> Statement shall also include, in a separate section, a list of each issue of material
> fact as to which it is contended there is a genuine issue for trial.
>
> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute
> shall be deemed admitted unless controverted in the Counter-Statement of
> Disputed Facts.

(Scheduling Order at 2-3).

In compliance with this Court's guidelines, in support of its Motion for Summary

Judgment, Defendant filed a "Statement of Material Facts Not In Dispute" ("Def.'s Stmt.").  In

response to that submission, Plaintiffs filed a "Counter-Statement of Disputed Facts" ("Pls.'

Stmt.").

The following material facts are gleaned from the evidence submitted by the parties,

2

viewed in the light most favorable to Plaintiffs, the non-moving parties.

Defendant is an airport concession company that owns and operates a number of restaurants and concession stores in ten airports across the country. (Def.'s Stmt. & Pls.' Stmt. at ¶ 1). Plaintiffs Ristovski, Sullivan, and Abbas were each employed at different restaurants operated by Defendant at Detroit Metropolitan Airport. (*Id*. at ¶ 2).

At all relevant times, Dean Hachem has been Defendant's Chief Operating Officer. Marwan Wehbe has been Defendant's Regional Operations Manager. (Wehbe Dep. at 8-9). Chef Rudy Rummal is also a manager who oversees Defendant's properties at the airport. (*Id*. at 12; Hachem Dep. at 15-17).

Hachem testified that are three upper-level managers (Wehbe, Brian Henson, and Rummal), that he refers to as the "management team" in Detroit. Hachem testified that those three men, along with Hachem and Defendant's HR department, make the decisions regarding the hiring and firing of employees at Defendant's restaurants. (Hachem Dep. at 14-17 & 27). Hachem testified that he cannot recall any instance wherein someone other than those upper-level managers fired an employee. (*Id.* at 28).

Rummal testified that he was involved in interviewing and hiring employees and that was done "as a group in the office." (Rummal Dep. at 35).

Defendant offered $50.00 to employees for each referral who was hired and stayed employed by the company for six months. (Ristovski Affidavit at ¶ 4). Hachem testified that all employees, including hourly employees, are encouraged to bring in employees through referrals:

> Q.    Has an hourly employee ever recommended an employee or referred an employee to be hired?
> A.    Hourly employees, they bring their friends and work in the kitchen, utility or bus boys or cooks. They bring employees. Everyone can bring

employees to the company.
Q.       Every employee can recommend an employee?
A.       Yes, referrals.

(Hachem Dep. at 60).

### 1.    Ristovski

Ristovski worked for Defendant from April, 2014 until September, 2015. (Def.'s Stmt. &

Pls.' Stmt. at ¶ 3).   She worked at three different restaurants.

Rummal testified that Ristovski did not have the authority to hire or fire employees, but

could make recommendations to the office:

Q.       Would Miss Ristovski be in charge of hiring employees?
A.       She was interviewing some employees, but normally the office have the
         last talk about hiring.  She can tell I know X person, he is a cook and I
         want him to work with us and then she can interview him and Marwan
         interview him or Jeff or, you know, and then she will be involved with
         that, yes, but hiring is the office.
Q.       Do you know any employees that she interviewed?
A.       I know some of the dishwashers, two dishwashers and one busboy and
         other people, yes, cooks.
Q.       Do you remember any of their names?
A.       Mm-mm, no.
Q.       Would Miss Ristovski be able to fire employees?
A.       No, she can tell Marwan or any firing have to go by the office.  The office
         will tell us we are in a good position to fire somebody or not.

(Rummal Dep. at 28-29).

During that time period she was employed by Defendant, Ristovski estimates that

approximately 100 to 150 employees were hired by the company.  (Ristovski Affidavit).  During

her employment, Ristovski participated in only three employee interviews, including Shayne

Dolby.  (Ristovski Affidavit; Ristovski Dep. at 33).  Ristovski recommend that Dolby not be

hired, but that recommendation was not followed.  (Ristovski Affidavit at ¶ 3; Ristovski. Dep. at

33).  Ristovski recommended that Sullivan be hired and he was hired by Defendant.  (Ristovski.

Dep. at 34)

None of Ristovski's recommendations for giving kitchen staff raises were adopted. (Ristovski Affidavit at ¶ 10).

Ristovski was initially offered, and accepted, employment at Mediterranean Grill and her title was "Manager."  (Def.'s Stmt. & Pls.' Stmt. at ¶ 7; Def.'s Ex. 7).  Her starting salary was $40,000 per year.  (Def.'s Stmt. & Pls.' Stmt. at ¶ 9; Def.'s Ex. 7).

Ristovski testified that while at Mediterranean Grill, she did not supervise any employees and worked on the line "nonstop for six weeks."  (Ristovski Dep. at 40).  Ristovski testified that she had keys to the restaurant and could open and lock the gate.  (*Id.* at 41).  She testified that she did not have keys to the manager's office at the restaurant but could go in there because the door was not locked.  Ristovski collected the money from the waitresses at the end of the shift. (Ristovski. Dep. at 41).  She did not order provisions at the restaurant, Rudy and Hassan did that. (*Id.* at 42).  Ristovski testified that she did not work on schedules at this restaurant, and did not set the rates of compensation for employees.  (Ristovski Dep. at 43).  Unlike hourly employees or line cooks, Ristovski had the ability to void orders and give discounts to customers.  (Def.'s Stmt. & Pls.' Stmt. at ¶ 16; Ristovski Dep at 86-87).

After approximately six weeks, Ristovski was transferred to Max & Erma's, another restaurant operated by Defendant at the airport.  (Def.'s Stmt. & Pls.' Stmt. at ¶ 10).  She worked there for approximately seven to eight months.  (*Id*. at ¶ 11).

At Max & Erma's, Ristovski supervised four line cooks.  (Def.'s Stmt. & Pls.' Stmt. at ¶ 13).  Ristovski testified that she directed employees at that restaurant, showing them how to cook, how to keep things moving on the line, and how to make the ticket times better.  (Ristovski

5

Dep. at 39 & 44). Unlike hourly employees, Ristovski had a key to the restaurant. (*Id*. at 42). That restaurant had no manager's office. (*Id*. at 42). Rather, it had an area with a desk and computer, which Ristovski has access to. Ristovski had access to emails that were only accessible to managers. (*Id*. at 43).

Ristovski testified that she did not work on schedules at Max & Erma's and did not set the rates of compensation for employees. (Ristovski Dep. at 43). Unlike hourly employees or line cooks, Ristovski had the ability to void orders and give discounts to customers. (Def.'s Stmt. & Pls.' Stmt. at ¶ 16; Ristovski Dep at 86-87).

Ristovski worked at Andiamo for approximately three or four months. (Ristovski Dep. at 45). While at Andiamo, Ristovski supervised and directed the work of five or six employees. (Ristovski Dep. at 44; Def.'s Stmt. & Pls.' Stmt. at ¶ 17). Ristovski testified that she did not work on schedules at this restaurant, and did not set the rates of compensation for employees. (*Id*. at 43). Unlike hourly employees or line cooks, Ristovski had the ability to void orders and give discounts to customers. (Def.'s Stmt. & Pls.' Stmt. at ¶ 16; Ristovski Dep. at 86-87).

### 2. Sullivan

Sullivan worked for Defendant from June 17, 2015 through July 24, 2015. (Def.'s Stmt. & Pls.' Stmt. at ¶ 4). Sullivan was offered, and accepted, employment at Andiamo as an Assistant Kitchen Manager, at an annual salary of $36,000. (Def.'s Stmt. & Pls.' Stmt. at ¶ 29). As to his hiring, Sullivan testified:

>     Q.    And how is it that you came to MCE?
>     A.    I was essentially offered the job by Elizabeth [Ristovski].
>     Q.    And you were convinced she had the authority to hire and fire?
>     A.    Yes, via my understanding of the situation.
>     Q.    Okay.
>     A.    I don't know if that was the actual facts of the matter. I believe Marwan

6

and Rudy did the hiring.

Q.     Did she reach out to you and say, hey, look, I want you to come work
       here?

A.     Correct.

Q.     And she said, I can get you in?

A.     Correct.

Q.     Okay.  So whether she was making the final decision or not, she certainly
       could recommend your hire?

A.     Yes, sir.

Q.     And you don't know if she made the final decision or not --

A.     Correct.

Q.     – as you sit here today.

A.     Correct.

(Sullivan Dep. at 12-13).

Sullivan testified as follows, pertaining to the work he performed at Andiamo after he

was hired:

Q.     Okay.  How would you – well, let me ask you this way.  At MCE did you
       order food?

A.     I did not.

Q.     Did you order supplies?

A.     I did not.

Q.     Did you order anything?

A.     I did not.

Q.     Did you receive food or bar products?

A.     Yes.

Q.     Okay.  And did you make sure that people complied with food safety
       requirements, dating, rotating, and the like?

A.     Yes.

Q.     Okay.  Did you have responsibilities at MCE for maintaining the
       equipment and cleanliness and sanitation?

A.     Yes, the sanitation.  I didn't do any maintenance on any – on any of the
       machines.

Q.     Just cleaning?

A.     Yes.

Q.     Did you coordinate with superiors regarding meetings and appointments
       and staffing at MCE?

A.     No.

Q.     Okay.  Did you prepare and cook items at MCE?

A.     Yes, sir.

Q.     And did you open the kitchen or close the kitchen?

7

A.      I was part of a team that closed the kitchen.

(Sullivan Dep. at 15-16).

Sullivan had the authority to void items if a customer was displeased with his or her meal.  (Def.'s Stmt. & Pls.' Stmt. at ¶ 32).  He testified that he only did that once or twice during the time period that he worked there.  (Sullivan Dep. at 27).

Sullivan testified that Ristovski was his direct supervisor and that she could tell him what time she needed him to be in to work.  (*Id*. at 41-42).  Sullivan testified that he was second in command, after Ristovski:

> Q.      Okay.  Did anybody report to you?
> A.      Not directly.
> Q.      How about –
> A.      They would – they would go to Elizabeth, and if Elizabeth wasn't there, I would be second in command.
> Q.      Elizabeth was the on-site manager?
> A.      In the back of the house, yes.
> Q.      Okay.  What about in the front of the house?
> A.      I believe there was two different ones, Mike Seif and John – I can't remember his name.
>
> . . . .
> Q.      Okay.  And were there times where Elizabeth would be gone and you were running the show?
> A.      Yes.
> Q.      How often would that happen?
> A.      Couple of times a week.
> Q.      For how long?
> A.      Two hours, maybe.  We tried to make it so she would be the breakfast chef and I could be the night chef so we could --
> Q.      Would you guys overlap, though?
> A.      Yes, yes for a couple hours every day.

(Sullivan Dep. at 27-28 & 44-45).  He further testified:

> Q.      While you were at Andiamo, did you make any changes to the menu or suggestions for the menu?
> A.      No, sir.

8

> Q.    Did you make any recommendations about hiring or firing?
> A.    No.
> Q.    Did you hire or fire anybody?
> A.    No, sir.
> Q.    Did you evaluate any employees at Andiamo?
> A.    Written, no.
> Q.    Verbal?
> A.     No.
> Q.    When you say it like that, it makes me wonder if there's something I'm
>        missing.
> A.    I mean I spoke to – you know, I obviously spoke to the people I worked
>        with and made sure that they were doing things the correct way, but
>        outside of that, I didn't have any authority.
> Q.    So the other sous chefs, you would say, look, I think this is a better
>        technique for this and the like?
> A.    Try to control the flow of the pace, you know what I mean, of the kitchen.
> Q.    Did you train any of the sous chefs?
> A.    No, sir.

(*Id*. at 31-32).

Sullivan testified that he did not make any hiring or firing recommendations during the

time period he was employed by Defendant:

> Q.    Okay.  You didn't recommend anyone for promotions or hiring or firing
>        because none of that happened during your four or five or six-week stint
>        there, right?
> A.    Yeah, yeah.  And the people I know are too expensive.

(*Id.* at 46).  Rummal also testified that Sullivan was not able to hire or fire employees.  (Rummal

Dep. at 41).

Sullivan testified that he and Ristovski each had a transport badge, meaning that they

could bring visitors without boarding passes into the airport.  (*Id*. at 37-38).

**3.    Abbas**

Abbas worked for Defendant from May 1, 2014 through March 20, 2015.  (Def.'s Stmt.

& Pls.' Stmt. at ¶ 6).

9

Abbas was offered employment with Defendant as an Assistant Manager, earning

$32,000 per year.  (Def.'s Stmt. & Pls.' Stmt. at ¶ 38).  Abbas worked at the Mediterranean Grill.

(Abbas Dep. at 44).  Abbas testified:

> Q.  Okay.  Did you ever interview anybody that was hoping to get a job at Mediterranean Grill?
> A.  No.
> Q.  Did you ever train anybody?
> A.  No.
> Q.  Did you ever write up schedules for hours for people to work?
> A.  No.
> Q.  Did you ever set pay for any individual?
> A.  No.
> . . . .
> Q.  Okay.  So you worked there less than a year, correct?
> A.  Correct.
> Q.  Did you ever – as the assistant manager, were you ever the highest ranking person on site?
> A.  No.
> Q.  Would there always be a full manager on site?
> A.  Always was Radwan or Rudy, you know, in the area, you know.  Not exactly in Med. Grill, but in the terminal.
> Q.  Okay.  Well, my point it, were you ever the highest-ranking employee on site at Mediterranean Grill?
> A.  Yes.
> Q.  All right.  And how many employees would you be supervising at any given time when you were there?
> A.  Eight or ten.

(Abbas at 45-46).

Abbas made sure that people punched the time clock correctly.  (Abbas Dep. at 47).

Abbas testified that employees would bring some complaints to him, but would bring other

complaints to higher-level managers.  (Abbas Dep. at 48-49).

Abbas never recommended that anyone be hired or fired.  (Abbas Dep. at 46 & 49).

Abbas did give his superiors his opinion as to whether someone was a good employees or a bad

employee on a few occasions:

10

Q.      So let's say one of those eight or ten employees that you were supervising, you caught him or her spitting on food.  What would you have done?

A.      If I see him, I'll stop him and I'll call Radwan or Rudy.

Q.      Would you recommend that the person be terminated or disciplined?

A.      Well, I wasn't authorized to do that.

Q.      You couldn't even make a recommendation?

A.      I can tell Rudy or Radwan he did that, and the decision for him.

Q.      Did you ever give your opinion as to whether or not someone was a good or bad employee?

A.      Yes.

Q.      Okay. How often would you do that?

A.      Not much.  Just few times.

Q.      And if someone was a bad employee, would you say, look, honestly, this person is not going to make it here, you should terminate them?

A.      No. I — we used to talk when he – when Marwan or Rudy asked me, Rudy or Marwan asked me about someone, I say, he doing the job or he's not doing his job, he's good or not, but hiring and firing, it's up to them.

Q.      So isn't it true that Marwan or Rudy would say, hey, look, Abbas, what do you think, should we get rid of this guy?

A.      They never asked me that.

(Abbas Dep. at 46-47).

Rummal testified that Abbas could refer candidates to him or "the office" but that Abbas could not hire employees.  (Rummal Dep. at 35).

Abbas testified that he directed the work of employees at times, such a directing them to marry (combine) ketchup or salt containers.  (Abbas Dep. at 50).

Abbas testified that, during the last couple months of his employment, he took inventory and determined what items needed to be ordered.  (*Id*. at 51).

Abbas had keys to the restaurant.  (Def.'s Stmt. & Pls.' Stmt. at ¶ 48).  He also monitored compliance with food safety requirements.  (Abbas Dep. at 52).  Abbas would handle some customer complaints, when asked to do so by waitstaff.  (*Id.* at 53-54).  Abbas had a card that would allow him to void items or provide discounts.  (Def.'s Stmt. & Pls.' Stmt. at ¶ 49).  Abbas would act as a cashier and count out the drawer, a task only done by managers  (Def.'s Stmt. &

11

Pls.' Stmt. at ¶ 46; Abbas Dep. at 62).

When Mediterranean Grill was closed by Defendant, Abbas was moved to a different concession area operated by Defendant, called Water Works.  (Def.'s Stmt. & Pls.' Stmt. at ¶ 50).  Abbas quit when Hachem asked him to move a refrigerator and clean the area behind it. (Def.'s Stmt. & Pls.' Stmt. at ¶ 51).

## ANALYSIS

"The FLSA lays out a general rule that employees must be compensated one and one-half times their regular hourly pay for each hour worked in excess of forty fours per week.  29 U.S.C. § 207(a)(2)."  *Henry v. Quicken Loans, Inc*., 698 F.3d 897, 899 (6th Cir. 2012).   As the parties recognize, however, there are exceptions to that general rule.

"FLSA exemptions are affirmative defenses on which the employer has the burden of proof, and those exemptions are to be narrowly construed against the employers seeking to assert them."  *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 502 (6th Cir. 2007).  The defendant employer must establish through "clear and affirmative evidence" that the employee meets "every requirement" of an exemption.  *Ale v. Tennessee Valley Auth*., 269 F.3d 680, 691 n.4 (6th Cir. 2001).

The only exception at issue here, the one claimed by Defendant, is the "bona fide executive" capacity exception (the "executive exception").

The parties agree that Courts determine whether an employee meets the executive exception by applying Department of Labor regulations.  It is undisputed that, pursuant to the applicable regulations, the term "employee employed in a bona fide executive capacity" means an employee:

1) "Compensated on a salary basis at a rate of not less than $455 per week;"

2) "Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;"

3) "Who customarily and regularly directs the work of two or more other employees;" *and*

4) "Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of employees are given particular weight."

29 C.F.R. § 541.100(a) (emphasis added). Thus, the defendant-employer must establish that all four apply to a given employee in order for that employee to be exempt.

Notably, there are disputes as to each of the four elements. Because the Court concludes that a fact issue exists as to the fourth element, however, the Court need not reach the other elements.

In order for an employee to be considered "employed in a bona fide executive capacity" the defendant claiming the exemption must show that plaintiff was an employee "[w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of employees are given particular weight." 29 C.F.R. § 541.100(a).

The regulations provide that "[t]o determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to": 1) "whether it is part of the employee's job duties to make such suggestions and recommendations;" 2) "the frequency with which such suggestions and recommendations are made or requested;" and 3) "the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. The regulations further provide that:

> Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

*Id.*

In *Lovelady*, the district court granted summary judgment to the defendant employer, finding the plaintiff employees were exempt from overtime under the executive exception. *Lovelady v. Allsup's Convenience Stores, Inc.,* 304 F. App'x. 301 (5th Cir. 2008).  The Fifth Circuit affirmed, agreeing that the employer had shown that the plaintiff employees had the authority to hire and fire other employees or that their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight.  *Id*. at 305.  In doing so, the Fifth Circuit explained:

> With respect to hiring, Lewis and Schumacher each testified that while they had to obtain final approval from their supervisor or the home office, their hiring recommendations were almost always followed. The only noted exception was when a background check on a recommended employee disclosed a criminal record.  As to firing, Lewis testified that there were no employees that she was not allowed to fire, and Schumacher testified that she fired an employee without seeking authorization from a higher manager.  In addition, Lewis and Schumacher testified that their recommendations were followed with respect to other personnel matters, such as promotions and raises.  We conclude the Lewis and Schumacher had the authority to hire and fire other employees or, at the very least, their suggestions and recommendations were given particular weight.

*Id*. at 306.

In *Madden*, the Eighth Circuit included parenthetical summaries of various cases wherein the fourth element was found to have been met:

> *See, e.g., Lovelady v. Allsup's Convenience Stores, Inc.,* 304 Fed. Appx. 301, 306 (5th Cir. 2008) (per curiam) (unpublished) (affirming the district court's decision

14

that plaintiff-store managers met the fourth element because their hiring
recommendations were almost always followed and they could fire employees
without obtaining authorization from a higher manager); *Grace v. Family Dollar
Stores, Inc*., 845 F.Supp.2d 653, 663 (W.D.N.C. 2012)(finding fourth element
satisfied because plaintiff, a store manager, selected applicants for interviews,
conducted interviews, and recommended employees for promotions and
demotions, and her recommendations were almost always followed by the district
manager); *Rainey v. McWane, Inc*., 552 F.Supp.2d 626, 632 (E.D. Tex. 2008)
(finding fourth element satisfied because plaintiff, a production supervisor,
completed weekly employee evaluations, recommended employee discipline, and
recommended which temporary employees should be hired permanently); *Goulas
v. LaGreca*, No. 12-898, 2013 WL 2477030, at *10 (E.D. La. June 7, 2013)
(finding fourth element satisfied because the employer was grooming the plaintiff
to eventually take over the company, and the employer terminated employees
based on plaintiff's recommendations). These cases provide useful guidance for
understanding what is needed to satisfy the fourth element of the executive
exemption.

*Madden v. Lumber One Home Center, Inc.*, 745 F.3d 899, 904 (8th Cir. 2014).

The Honorable Judith Levy addressed this fourth element in *Duffie v. The Michigan

Group, Inc*., 2016 WL 28987 (E.D. Mich. Jan. 4, 2016), along with the other elements.   In that

case, the court denied summary judgment, explaining as follows as to this element:

> To show that an employee's suggestions and recommendations are given
> "particular weight," the employer must show, among other things, the "frequency
> with which such suggestions and recommendations are made or requested; and
> the frequency with which the employee's suggestions and recommendations are
> relied upon."  29 C.F.R. 541.105. This "does not include an occasional suggestion
> with regard to the change in status of a co-worker." *Id*.

> Defendant has shown that it requested plaintiff give suggestions and
> recommendations four times in three years, and that it relied in some part on her
> suggestions and recommendations twice in those three years. Defendant argues
> that because there were so few hiring and firing situations in Central, the Court
> must instead look to the relative size of the workforce and the total number of
> times an employee was hired or fired.

> The issue here is that, because there were so few such scenarios, plaintiff's input
> as to the hiring and firing of one employee could be characterized either as an
> "occasional suggestion" or as routine participation. Defendant has established
> that, in the four situations plaintiff participated in, it relied on her input twice. At

15

the summary judgment stage, those two instances are insufficient to conclusively establish that defendant relied on plaintiff's input often enough that her input was given "particular weight."

Defendant has failed to meet its burden in establishing that plaintiff was subject to the FLSA's executive exemption. Accordingly, the Court must deny summary judgment as to this argument.

*Id.* at * 13.

## A.    Ristovski

With respect to Ristovski, Defendant contends that it has made the requisite showing because "Ristovski admittedly recommended Sullivan for employment, who was promptly hired by MCE and testified that he was 'essentially offered the job by [Ristovski]' and that it was his understanding she had the authority to hire and fire. (Ex. 9, pp. 12-13). Ristovski also sat in on interviews with MCE's upper management, asked questions during interviews, provided her opinion at the conclusion of the interviews, and could make hiring recommendations." (Def.'s Br. at 16-17).

There is a genuine issue of fact for trial on this element as to Ristovski. Construing the evidence in the light most favorable to Ristovski, the evidence pertaining to this fourth element is as follows as to Ristovski:

- Hachem testified that are three upper-level managers (Wehbe, Brian Henson, and Rummal), that he refers to as the "management team" in Detroit. Hachem testified that those three men, along with Hachem and Defendant's HR department, make the decisions regarding the hiring and firing of employees at Defendant's restaurants. (Hachem Dep. at 14-17 & 27). Hachem testified that he cannot recall any instance wherein someone other than those upper-level managers fired an employee. (*Id.* at 28)

- Defendant offered $50.00 to employees for each referral who was hired and stayed employed by the company for six months. (Ristovski Affidavit at ¶ 4). Hachem testified that all employees, including hourly employees, are encouraged to bring in employees through referrals. (Hachem Dep. at 60).

16

- Rummal testified that Ristovski did not have the authority to hire or fire employees, but could make recommendations to the office. (Rummal Dep. at 28-29).

- During the approximately year and a half that Ristovski was employed by Defendant, Ristovski estimates that Defendant hired 100 to 150 employees. (Ristovski Affidavit).

- Ristovski participated in a total of three interviews. (Ristovski Affidavit and Ristovski Dep. at 33-34).

- Ristovski recommended that one of the persons (Dolby) not be hired, but that recommendation was not followed. (*Id*.).

- Ristovski recommended that Sullivan, who she referred to Defendant, be hired and he was hired. (*Id*.).

- None of Ristovski's recommendations for giving kitchen staff raised were adopted. (Ristovski Affidavit).

In sum, this evidence indicates that Ristovski did not have the authority to hire and fire. But Defendant can show that Ristovski participated in three interviews and may possibly be able to show that Ristovski's input was given "particular weight." Ristovski's claim shall proceed to trial.

**B.      Sullivan**

With respect to Sullivan, Defendant contends that it has made the requisite showing because "Sullivan testified that he did not recommend anybody for promotions, hiring, or firing during his very brief tenure because none of that happened – according to him, 'the people I know are too expensive.'" (Def.'s Br. at 17).

Construing the evidence in the light most favorable to him, the evidence pertaining to this fourth element is as follows as to Sullivan:

- Hachem testified that are three upper-level managers (Wehbe, Brian Henson, and Rummal), that he refers to as the "management team" in Detroit. Hachem testified that those three men, along with Hachem and Defendant's HR department, make the decisions regarding the hiring and firing of employees at Defendant's restaurants. (Hachem Dep. at

17

14-17 & 27).  Hachem testified that he cannot recall any instance wherein someone other than those upper-level managers fired an employee.  (*Id.* at 28)

•      Rummal testified that Sullivan was not able to hire or fire employees.  (Sullivan Dep. at 41).

•      Sullivan testified that he did not evaluate any employees, either verbally or in writing.  (Sullivan Dep. at 31-32).

•      Sullivan testified that he did not make any hiring or firing recommendations during the time he was employed by Defendant.  (Sullivan Dep. at 46).

The Court shall deny Defendant's motion for summary judgment as to Sullivan.

## C.    Abbas

With respect to Abbas, Defendant contends that it has made the requisite showing because "Abbas admitted that he would provide his opinions to upper management regarding whether certain individuals were good or bad employees and that upper management would ask him specifically about whether employees were doing a good job."  (Def.'s Br. at 17).

The Court concludes that Defendant is not entitled to summary judgment on its affirmative defense as to Abbas.  Construing the evidence in the light most favorable to him, the evidence pertaining to this fourth element is as follows as to Abbas:

•      Hachem testified that are three upper-level managers (Wehbe, Brian Henson, and Rummal), that he refers to as the "management team" in Detroit.  Hachem testified that those three men, along with Hachem and Defendant's HR department, make the decisions regarding the hiring and firing of employees at Defendant's restaurants.  (Hachem Dep. at 14-17 & 27).  Hachem testified that he cannot recall any instance wherein someone other than those upper-level managers fired an employee.  (*Id.* at 28)**.**

•      Defendant offered $50.00 to employees for each referral who was hired and stayed employed by the company for six months.  (Ristovski Affidavit at ¶ 4).  Hachem testified that all employees, including hourly employees, are encouraged to bring in employees through referrals.  (Hachem Dep. at 60).

•      Rummal testified that Abbas could refer candidates to him or "the office" but that Abbas could not hire employees.  (Rummal Dep. at 35).

18

- Abbas testified that he never interviewed anyone seeking a job at the restaurant. (Abbas Dep. at 45).

- Abbas testified that he never recommended that anyone be hired or fired. (Abbas Dep. at 46 & 49).

- But Abbas did give his superiors, "just a few times," his opinion as to whether someone was a good or bad employee. (Abbas Dep. at 46-47).

The Court shall deny Defendant's motion for summary judgment as to Abbas.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is DENIED and Plaintiffs' claims shall proceed to trial.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  August 22, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 22, 2017, by electronic and/or ordinary mail.

s/Teresa McGovern
Case Manager Generalist